92 635
43a 204

UNION SAVINGS ASSOCIATION v. SELIGMAN *et al.*, *Appellants.*[*]

1. **Corporation:** LIABILITY AS STOCKHOLDER: STOCK HELD AS COLLATERAL. One who accepts a certificate of stock of a corporation, under an agreement in writing that it is held by him only as collateral security, is not thereby rendered liable as a stockholder, either to the corporation or its creditors.

2. ———— : ————. One's liability as a stockholder of a corporation to the creditors thereof depends upon his legal relation to the corporation. If he is a stockholder, as between himself and the corporation, he will be liable, as such, to the creditors of the corporation, but otherwise not.

3. ———— : ————: VOTING OF STOCK HELD AS COLLATERAL. Where stock of a corporation is held under a written agreement only as

*Decided at April Term, 1884.

collateral security, the act of voting it, by the parties so holding it, would not make them absolute stockholders, either as between themselves and the corporation, or creditors of the corporation, and in either case such holders would have the right to show that they held the stock as collateral security.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*J. O. Broadhead* for appellants.

*Botsford & Williams* and *Joseph Shippen* for respondent.

HENRY, J.—This is a proceeding, by motion, in the St. Louis circuit court, for execution against Seligman as a stockholder on a judgment in favor of plaintiff, against the Memphis, Carthage & Northwestern Railroad Company, an execution having issued thereon against said company, on which a return of *nulla bona* was made. Defendant resisted the motion, on the ground that he was never a stockholder in said company, and this is the only question which it is necessary to consider. The cause was tried upon an agreed statement of facts, and plaintiff succeeded in his motion in the circuit court, and again in the court of appeals, to which the cause was appealed, and, from the judgment of the latter court, defendant has appealed to this court.

The facts are, substantially, the following: The Memphis, Carthage & Northwestern Railroad Company, a corporation organized under the laws of the state, with an authorized capital of ten million dollars, entered into a contract, in writing, with J. & W. Seligman, on the tenth of March, 1872, in which it was agreed that the railroad company should furnish the capital necessary to a complete preparation of the road for iron, and would execute and deposit with the Seligmans, its entire issue of first-mortgage bonds, viz.: five million dollars, and

a majority of their capital stock, the said stock to remain in the control of the Seligmans for one year, at least. The Seligmans agreed to purchase two thousand tons of iron, under the direction of the railroad company, and, from time to time, to make advances of cash, during the progress of the work on the road, not exceeding two hundred thousand dollars, including amount paid for iron, and to receive interest thereon at the rate of seven per cent. per annum, until reimbursed by a sale of bonds. For twelve months they were also to have the privilege of purchasing any portion of the five million dollars of bonds, at the rate of seventy cents and accrued interest, less two and a half per cent., and if more bonds were sold than enough to iron the road, they were to advance money to purchase rolling stock, two thousand dollars per mile, the balance to remain on deposit with them, on interest at the rate of call loans, to pay any deficiency in the net earnings of the road to meet interest on the bonds.

If the bonds, or part of them, could not be negotiated during the next twelve months, the company was to repay them all money advanced by them, with interest at seven per cent. per annum, and two and a half per cent. commission on all bonds returned. On the first of May, 1872, the company executed a deed of trust on its railroad and appurtenances, to Jesse Seligman and John H. Stewart, as trustees to secure said bonds, and in pursuance of the agreement and an order of the board of directors of said company, a certificate for sixty thousand shares of its stock was issued to J. & W. Seligman. The stock-transfer book of the company, which it was required to keep by law, contained the list of stockholders, and the stock issued to the Seligmans was entered therein as follows :

| Names. | Residence. | Date. | No. of Shares. | Amount in |
|---|---|---|---|---|
| J. & W. Seligman. | New York | Dec. 20, 1872. | 60,000. Sixty thousand held in escrow. | dollars. $6,000,000 Six Millions. |

In March, 1873, and again in March, 1874, at an election for directors of said company, the stock held by the Seligmans was voted at the first election by one Brown, and at the second by H. T. Blow, as proxies, and at the election in 1874, Joseph Seligman, one of the firm of J. & W. Seligman, was elected a director. The plaintiff's judgment was obtained on a note for $6,339, dated November, 1872—after the six million dollars of stock was issued to the Seligmans, but before any other act was done by them which could possibly be relied upon as an estoppel.

The simple act of accepting that certificate of stock, under an agreement in writing, which, as also the entry of the stock in the stock-book, the other records of the company, relating to the transaction, showed that it was held by them only as collateral security, does not make them liable, as stockholders, either to the corporation or its creditors. As long as they held the stock, under that agreement, doing no other act, their liability to creditors depended upon their legal relation to the company. If stockholders, as between themselves and the corporation, they would be liable, as such to creditors of the corporation, otherwise, not. *Burgess v. Seligman*, 107 U. S. 20.

The only ground upon which the defendant can be held liable as a stockholder is that of estoppel, and the act relied upon as creating it is that of voting the stock at elections of directors of the company. Waiving, for the present, a discussion of the question as to the right of the Seligmans to vote the stock, that act did not change their relation to the corporation. That was fixed by the written agreement, and the single act of voting the stock affords no ground for an inference that that agreement had been modified, and the Supreme Court of the United States, in the case of *Burgess v. Seligman*, *supra*, seems to hold that in no case can one be held as a stockholder by a creditor of the corporation, unless

the facts are such that he could be so held by the corporation itself. "The line of authorities usually quoted to show that those who actually hold stock, and who manifest a voluntary, or intentional holding, by voting on it [are liable, as stockholders, to creditors of the corporation] * * * consists mainly of cases in which parties have been held as corporators, or associates, as between themselves and the corporation, or joint-stock association, and, as such, incidentally liable to the creditors of such companies." I have supplied the words included in brackets in the foregoing paragraph of the opinion delivered by Mr. Justice Bradley, in *Burgess v. Seligman, supra.*

The cases cited in the opinion delivered by this court, in the case of *Griswold v. Seligman,* 72 Mo. 110, are all cases in which the facts were such that the persons sought to be charged as stockholders, were held to be stockholders as betwixt themselves and the corporation. In many of the cases, suits were instituted by the corporation against individuals, alleging that they were, and seeking to charge them as stockholders. In none of the cases cited in that opinion was there, as in this, a special agreement, showing exactly what relation the parties, alleged to be stockholders, bore to the corporation. The cases of *Upton v. Triblecock,* 91 U. S. 45; *Sanger v. Upton,* 91 U. S. 56, and *Webster v. Upton,* 91 U. S. 65, are all cases in which the corporation, or its assignees, asserted the liability of the defendant as a stockholder, and no cases cited in the opinion delivered in *Griswold v. Seligman, supra,* in which one was held liable as a stockholder, at the suit of a creditor of the corporation, who was not, as between himself and the corporation, held to be a stockholder.

The following quotations from Lindley on Partnership are cited, with approval, in that opinion: "Whenever a person has been treated as a shareholder, by the company, and has acted as a shareholder, both he and

the company will be estopped from denying that he is a shareholder." Lindley on Part. 129. "If a person is a member of a company, as between himself and the company, then, whether he is so by reason of his having become a member by complying with all requisite formalities, or by reason of the doctrine of estoppel, he ought, upon principle, to be deemed a member, to all intents and purposes." Lind. Part. 12. An argument based upon the doctrine announced by Lindley in order to have any force or application in this case, must assume that, as between the corporation and the Seligmans, the latter were stockholders, having all the rights, and resting under all the obligations of stockholders in the company. Will the law, from the act of the Seligmans, in evidence, imply a contract radically different from that contained in the written agreement between them and the corporation? Will it hold them as stockholders in a controversy between them and the corporation, because they voted the stock, which they held as collateral security for payment of the bonds of the company and for advances of money to the company, whether that stock was legally or illegally voted? If, supposing they had the right to do so, they voted the stock, shall they, for that, be held to have incurred an indebtedness to the company of six million dollars, when they supposed they were but protecting a demand they had against it for only several hundred thousand dollars?

The Supreme Court of the United States, in *Burgess v. Seligman, supra,* held that, whether the Seligmans had the right to vote the stock or not, the act of voting it did not make them absolute stockholders, either as between themselves and the corporation or creditors of the corporation, but that in either case, they had the right to show that they held the stock as collateral security, and not otherwise, and I am of that opinion. This case is not to be confounded with those in which persons, once stockholders, were, by the corporation, released from all

liability as such, but were still held liable, as share-holders, to creditors of the corporation, although the corporation itself might not have been able to hold them to liability as stockholders. But I think that section 9, article 11, Wagner's Statutes, page 301, exempts them from any liability as stockholders. It reads as follows:

" Section 9. No person holding stock in any such company, or executor, administrator, guardian, or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as stockholder of such company, but the person pledging such stock shall be considered as holding the same, and shall be liable as a stockholder accordingly; and the estates and funds in the hands of the executor, administrator, guardian, or trustee, shall be liable in like manner, and to the same extent, as the testator, or intestate, or the ward, or person interested in such fund would have been, if he had been living and competent to act, and held the same stock in his own name."

If the corporation had the right to issue a portion of its authorized capital stock, undisposed of, to be held as collateral security, then, by the express terms of the statute, the Seligmans are exempt from liability as stockholders. That the corporation had the right so to issue the stock, the Supreme Court of the United States held, in *Burgess v. Seligman, supra,* and the same ruling was made by the court of appeals of Maryland, in the case of *Mathews v. Albert,* 24 Md. 527. But if otherwise, then the Seligmans acquired no right, whatever, in the stock, either to hold or vote it, and certainly in the face of the written agreements between them and the company, they could not be held by the latter as absolute stockholders, and debtors to the company to the amount of six million dollars, when the sole intent of the transaction was that they should advance money to com-

plete and outfit the road, and hold the stock as collateral security for such advancement. To hold them liable to the company as stockholders, under such circumstances, would be grossly inequitable, and no authority can be found to sanction such a rule.

Our statute, section 9, *supra*, is a copy of the statute of Maryland, which was construed by the court of appeals of that state, in the case above cited, which bears a striking resemblance to this. One Tieman had loaned a corporation two thousand dollars, and, as security, a certificate of stock was issued to him, which, when issued, was absolute on its face, but subsequently an indorsement was placed upon it by the company, stating that it had been issued to Tieman as collateral security. It was contended that the case was not within the statute, and that Tieman was liable to creditors as a stockholder ; but the court of appeals gave the following answer to that question, Goldsborough, J., delivering the opinion of the court : "The claim of W. H. Tieman is for two thousand dollars, money alleged to be loaned to the company on the eighth day of January, 1859. But it is insisted by the appellees that Tieman, instead of being a non-stockholder, is, according to the evidence, a stockholder, and as much liable as the Alberts. We do not concur in this view of the relation of Tieman to the company. In our opinion, his claim is for money loaned, and the stock transferred to him was held by him as collateral security for his loan, and so holding it, he is not personally subject to any liability as stockholder ; but is protected by the provisions of the twelfth section of the acts of 1852, chapter 338." The Supreme Court of the United States, in *Burgess v. Seligman*, *supra*, placed the same construction upon the statute, and the same view of a similar statute was taken by the commissioners of appeal, in the state of New York, in *McMahon v. Macy*, 51 N. Y. 155.

The Supreme Court of the United States also held, in

*Burgess v. Seligman, supra,* that the Seligmans had a right to vote the stock held by them as collateral security. This right was necessary to their protection, and it seems to have been contemplated by the parties, that it should be voted. It was a majority of the authorized capital stock, and Jesse and Joseph Seligman testified that the stock was given them, in order that they might control the management of the company, so that its earnings should be honestly secured and appropriated to the payment of the bonds. Whether they had the right to vote the stock or not, voting it, under an impression that they had the right, certainly did not alter their relations to the corporation as established by the written agreement.

It is with reluctance that I agree to overrule any case decided by this court, and this reluctance is the greater where a line of decisions is to be overthrown, but the opinions delivered in the case of *Griswold v. Seligman,* 72 Mo. 110, and those following it never had my entire concurrence, and one member of the court dissented, and I am now satisfied that I should not have given even the partial concurrence which I expressed. The Supreme Court of the United States, every member of that bench concurring, has, since *Griswold v. Seligman, supra,* was decided by this court, announced doctrines in conflict with our rulings in that case. The court of appeals of Maryland placed a different construction upon their statute, of which ours is a copy, from that which we announced in *Griswold v. Seligman, supra,* and the commissioners of appeal of the state of New York, also, in the construction of a similar statute of that state, followed the decision in Maryland ; and while we are under no obligations to yield our own and adopt the opinions either of the Supreme Court of the United States, or of the appellate courts of sister states, it is our duty to receive light on doubtful questions, from whatever source it may come. It does not become us to shut our

eyes to what other respectable courts have held, and blindly follow what we have decided because we have decided it. As we said, in the *State ex rel. v. Brassfield*, 67 Mo. 34, "In cases appealed from this court to the Supreme Court of the United States we are bound by its mandates, but in other cases we are no more bound by its decisions than by those of any other respectable court."

Nor has the doctrine of *stare decisis* any application in this case. No rule of property was settled by the case of *Griswold v. Seligman, supra*. No one can possibly have given credit to the bankrupt corporation, on the faith of the ownership of this stock by the Seligmans, since that judgment was rendered, and there is no principle of law or equity to prevent us from rectifying the error we committed in that case and announcing what, we are now satisfied, are correct principles of law.

The judgment is reversed. Norton & Ray, JJ., concur. Sherwood, J., dissents. Hough, C. J., files separate opinion.

### SEPARATE OPINION.

Hough, C. J.—I am still of opinion that section 9, article 11, Wagner's Statutes, page 301, is not applicable to this case. That section provides that the person holding stock as collateral security shall not be liable as a stockholder ; "but *the person pledging such stock* shall be considered as holding the same, *and shall be liable as a stockholder*, accordingly." This statute, I think, clearly applies to stock which has been regularly issued by the company, and which has been pledged by the holder thereof; for, I cannot imagine that the legislature ever contemplated that the corporation itself should be held "liable as a stockholder" of its unissued stock. Undoubtedly, if all the stockholders of a corporation consent, the unissued stock may be sold for a nominal

Union Savings Association v. Seligman.

consideration, or be given away to any one they may select as the object of their bounty, and the person receiving such stock could not be made liable to the corporation for the full value thereof, but such person might nevertheless be held liable by creditors of the corporation for such proportion of the value thereof as remained unpaid. I conceive it to be against public policy to permit a corporation to put its unissued stock, to an amount sufficient to control the affairs of the corporation, in the hands of a person who is, in no event, to incur any responsibility, as a stockholder, to creditors, by holding and voting the same, and thus managing and controlling the affairs of the corporation.